# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| JOSEPH STOCKE, et al., | |
| Plaintiffs, | Case No. 2:07-CV-00715-KJD-RJJ |
| v. | **ORDER** |
| SHUFFLE MASTER, INC., et al., | |
| Defendants. | |

Currently before the Court is Defendants' Motion to Dismiss (#70), filed March 25, 2008. Plaintiffs filed a Response (#73) on May 2, 2008, to which Defendants filed a Reply (#75) on May 30, 2008. Also before the Court is Defendants' Request for Judicial Notice (#72), filed March 25, 2008, and Defendants' Supplemental Request for Judicial Notice (#76) filed May 30, 2008. Additionally, the Court has reviewed and considered Defendants' Supplement to its Motion to Dismiss (#77), filed August 11, 2008, and Plaintiffs' Response to Supplement (#78), filed August 20, 2008, as well as Plaintiffs' Supplement to Defendants' Motion to Dismiss (#79), filed September 17, 2008, and Defendants' Response (#80), filed September 24, 2008.

Having considered the Requests for Judicial Notice, good cause appearing, the Court hereby grants Defendants' Request for Judicial Notice (#72), and Defendants' Supplemental Request for

Judicial Notice (#76). The Court examines these documents in its analysis of Defendants' Motion to Dismiss herein.

**I. Background**

Lead Plaintiffs City of Tulsa Municipal Employees Retirement Plan ("Tulsa") and Oklahoma Firefighters Pension and Retirement System ("Oklahoma") (collectively referred to as "Plaintiffs") have brought this federal securities fraud action on behalf of all purchasers (the "Class") of common stock of Shuffle Master, Inc. ("Shuffle Master" or the "Company") between and including February 1, 2006, and March 12, 2007 (the "Class Period") against Shuffle Master, MarkYoseloff ("Yoseloff"), and Richard L. Baldwin ("Baldwin") (together referred to as "Defendants") for violations of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiffs allege that Defendants made false statements to investors and engaged in accounting fraud in violation of Sections 10(b) and 20(a) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5, and that Yoseloff and Baldwin profited from their fraud by selling their Shuffle Master stock before the fraud was revealed. Plaintiffs filed an Amended Complaint, (#66) on February 5, 2008, bringing two causes of action, for (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5; and (2) violation of Section 20(a) of the Exchange Act by the individual Defendants.

Shuffle Master is a company that specializes in providing gaming products such as automatic card shufflers, intelligent table systems, roulette chip sorters, and other gaming related entertainment products to the gaming and casino industry. Defendant Dr. Mark Yoseloff is Shuffle Master's Chairman and Chief Executive Officer ("CEO") and Defendant Richard Brown served as Shuffle Master's Chief FinancialOfficer ("CFO") during the alleged Class Period. Prior to the Class Period, Shuffle Master experienced enormous revenue growth through the development and sale of new products, resulting in a concomitant increase in the Company's share price.

Plaintiffs allege that beginning in the fourth quarter of 2005, Shuffle Master resorted to fraudulent means in order to maintain its stock value. Specifically, Plaintiffs allege that Defendants

improperly recognized revenue from inter-company transactions, engaged in improper accounting practices, lied to investors about business prospects, and manipulated financial results.

Specifically, Plaintiffs allege that Defendants' improper accounting practices led to the artificial inflation of its fourth quarter 2006 earnings by nearly 50% and its full year 2006 earnings by over 30%. Additionally, Plaintiffs allege that Shuffle Master misled the investing public as to the measures purportedly taken to improve Shuffle Master's internal controls. Allegedly, after acknowledging that weaknesses in its internal accounting controls required two write-downs for transactions that occurred in 2005, Shuffle Master issued public assurances that its internal controls system would be examined and corrected, and that such remedial measures would remain a "priority." Plaintiffs allege that Shuffle Master failed to correct the deficiencies in its internal controls, allowing fraud to continue and remain concealed from the public.

In 2005, Shuffle Master acquired an Australian company called Stargames that produces casino table games. Upon acquiring Stargames, Shuffle Master issued a press release announcing the completion of the acquisition, and stating, *inter alia*, that it anticipated the transaction would be "modestly accretive", and targeted "approximately 25% growth in quarter-over-quarter and year-over-year fiscal 2006 earnings per share, . . ." (Compl. at ¶ 50.)

Plaintiffs allege that during their due diligence prior to the Stargames acquisition, Shuffle Master and its executive officers recognized that the much lower profit margins on sales of Stargames' products would prevent the Company from meeting the expectations it had projected. Rather than disappoint investors or admit that the Company would be unable to sustain its previous earnings growth rates, the Defendants allegedly issued false and misleading financial reports and statements in order to artificially prop up the Company's share price. Plaintiffs allege that Defendants misrepresented the progress of the Company's integration of Stargames and the financial benefits accruing to Shuffle Master from that acquisition, and that Defendants manipulated Shuffle Master's financial results, including using a wholly-owned subsidiary to record profits from a

1  transfer of inventory between Shuffle Master corporate entities, thereby inflating Shuffle Master's
2  earnings.

3        Plaintiffs allege that Yoseloff and other Company executives began to liquidate their stock
4  holdings before the alleged fraud was made public.  Specifically, Plaintiffs allege that during the
5  Class Period, Yoseloff sold over 300,000 shares of Shuffle Master stock, making about $7 million,
6  and that other Company executives also sold their stock for a total of another $6.7 million.

7        On February 27, 2007, however, the Company announced that its revenue growth had
8  declined markedly and its earnings guidance for fiscal 2007 would be suspended.  On March 12,
9  2007, Shuffle Master announced that it would need to restate its financial statements for fiscal year
10 2006 to reverse the inter-company profits that it had previously recorded and to make other
11 corrections to its financial results.  The following day, Shuffle Master's stock declined in value by
12 8% to close at $17.81 per share.  Plaintiffs allege that while Yoseloff was able to liquidate over
13 300,000 shares of his Shuffle Master stock, Plaintiffs and other members of the Class ultimately
14 suffered millions of dollars in damages caused by the Defendants' fraudulent conduct.  Shuffle
15 Master's stock, which had traded as high as $40.33 per share on May 16, 2006, closed on February 5,
16 2008 at just $9.09 per share.

17       Defendants filed their Motion to Dismiss (#70), on March 25, 2008, seeking that the Court
18 dismiss Plaintiffs' Amended Complaint, arguing that Plaintiffs have failed to plead specific facts
19 giving rise to a strong inference of scienter as required under the Private Securities Litigation Reform
20 Act ("PSLRA").

21 **II. Standard of Law for Dismissal Under the Reform Act**

22       Section 10(b) of the Exchange Act forbids (1) the "use or employ[ment] . . . of any . . .
23 deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in
24 contravention of" Securities and Exchange Commission "rules and regulations." 15 U.S.C. § 78j(b).
25 Additionally, Commission Rule 10b-5 forbids, *inter alia*, the making of any "untrue statement of a
26 material fact" or the omission of any material fact "necessary in order to make the statements made

. . . not misleading." 17 CFR § 240.10b-5 (2004); <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 341–42 (2005).

To state a valid claim under Section 10(b) and Commission Rule 10b-5, a plaintiff must plead that: (1) defendants made a material misrepresentation or omission; (2) defendants acted with scienter; (3) there was a connection with the purchase or sale of a security; (4) plaintiffs relied on the alleged misrepresentation or omission; (5) plaintiffs suffered economic loss; and (6) the alleged misrepresentation or omission caused the loss from which plaintiffs seek to recover damages. <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 341–42 (2005).

In 1995, Congress concluded that more stringent pleading standards were required in order to deter "abusive securities fraud claims." <u>In re Silicon Graphics</u>, 183 F.3d at 973. Consequently, Congress passed the PSLRA which calls for exacting pleading requirements in §10(b) and Rule 10b5-1 actions. <u>See</u> <u>Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit</u>, 547 U.S. 71, 81 (2006). Specifically, § 21D(b)(2) of the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Thus a claim under the PSLRA must set forth with particularity, the facts constituting the alleged violation, as well as the facts evidencing scienter—the defendant's intention to deceive, manipulate, or defraud. <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308 (2007). The plaintiffs must show that defendants engaged in "knowing" or "intentional" conduct. <u>South Ferry LP, No. 2 v. Killinger</u>, 2008 WL 4138237 at *3 (9th Cir. Sept. 9, 2008) (citing <u>Silicon Graphics</u> 183 F.3d at 977). Additionally, reckless conduct can also meet this standard "to the extent that it reflects some degree of intentional or conscious misconduct," or what the Ninth Circuit has called "deliberate recklessness." (<u>Id.</u>)

Thus, when analyzing a 12(b)6 motion to dismiss under section 10(b), as with any 12(b) motion, the court must accept all factual allegations in the complaint as true <u>Id.</u> (citing <u>Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 507 U.S. 163, 164 (1993)). However, unlike the court's typical analysis under a 12b(6) motion wherein all inferences must be

5

construed in the light most favorable to the plaintiff, a motion to dismiss brought under the PSLRA requires that the court "must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499 (2007). Specifically, in Tellabs, the Supreme Court held that in order to determine whether a complaint's scienter allegations are sufficient under the PSLRA, "a court governed by § 21D(b)(2) must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499, 2504. Thus, "to qualify as 'strong' within the intendment of § 21D(b)(2), an inference of scienter must be more than merely plausible or reasonable—it must be at least as compelling as any opposing inference of nonfraudulent intent." Id.

Additionally, when analyzing a motion to dismiss under the PSLRA the court "must consider the complaint in its entirety . . . [t]he inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. at 2502. Specifically, in South Ferry LP, No. 2 v. Killinger, 2008 WL 4138237 (9th Cir. Sept. 9, 2008), the Ninth Circuit has recently held:

> a court should look to the complaint as a whole, not to each individual scienter allegation as Silicon Graphics suggests. Thus, Tellabs counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation. . . . Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter. . . . In assessing the allegations holistically as required by Tellabs, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.

South Ferry LP, No. 2 v. Killinger, 2008 WL 4138237 at **5.

6

## III. Analysis

Here, Defendants seek that the Court dismiss Plaintiffs' Complaint, alleging that Plaintiffs have failed to adequately demonstrate Defendants had the requisite scienter under the PSLRA. Plaintiffs, in opposition, argue that each alleged fraudulent action individually demonstrates Defendants had the requisite intent, or scienter, to withstand dismissal under the exacting standards of the PSLRA. Additionally, Plaintiffs argue that Defendants' alleged misconduct, when viewed holistically, demonstrates the requisite inference of scienter. Specifically, Plaintiffs allege (1) that Defendants knowingly misrepresented the benefits from the Stargames Acquisition to investors; (2) that Defendants knowingly engaged in various improper accounting practices in order to boost or maintain stock value; (3) that Shuffle Master had material weaknesses in its internal controls, and that Defendants knowingly misrepresented to investors that said weaknesses had been remediated, and; (4) that Defendants suspiciously sold stock options at opportune times.

### A. Stargames Acquisition Misrepresentations

Defendants aver that the Complaint fails to demonstrate any occurrence of fraud regarding the Stargames acquisition. The Complaint alleges that Defendants attempted to deceive investors about the benefits of the Stargames acquisition in statements they made regarding projected growth that Shuffle Master would achieve as a result of the acquisition. Specifically, on February 1, 2006, Shuffle Master issued a press release announcing the completion of the Stargames acquisition, stating in part, that they "anticipated the transaction will be modestly accretive to fiscal 2006 earnings per share and operating cash flows, with larger gains expected starting in the second full combined year." (Compl. at ¶ 50.) Additionally, Defendants stated "we are targeting approximately 25% growth in quarter-over-quarter and year-over-year fiscal 2006 earning per share, . . ." (Id.)

Plaintiffs allege that Dr. Yoseloff and Mr. Baldwin traveled to Australia to conduct due diligence before acquiring Stargames, wherein they learned about the profits earned by Stargames and the profit margins on Stargames products, and knew or recklessly disregarded that Stargames' products were far less profitable than Shuffle Master's products, and that the sales trends for each

7

company's product lines were such that Stargames' products would not deliver accelerating earnings growth. According to Plaintiffs, Defendants should have disclosed that the much smaller profit margins on Stargames' products would significantly lessen Shuffle Master's growth rate, and that 25% growth in earnings was not attainable. (Compl. at ¶ 51.)

During the second through fourth quarters of 2006, after the acquisition, Shuffle Master's growth declined rapidly due in large part to the negative impact on profit margins from Stargames' products, which had an average profit margin of only 5.6% from 2001 through 2005 (as compared to 27.3% on Shuffle Master products). (Compl. at ¶ 187.)

As evidence that Defendants knew or should have known that the acquisition of Stargames would not deliver the accelerating earnings growth it stated it anticipated, Plaintiffs offer testimony by Confidential Witnesses ("CW") that Yoseloff and Baldwin traveled to Australia, and that they "knew from their due diligence investigation . . . that the . . . accelerated revenue gains would never be realized." (Compl. at ¶ 49.) Plaintiffs allege that Defendants should have known this because of Stargames' average profit margin prior to acquisition. Additionally, Plaintiffs offer evidence to show that the acquisition was not a good business decision. Particularly, Plaintiffs provide testimony of CW1 that it was clear to him and others at Shuffle Master that the Stargames acquisition "was not a great purchase" and was in fact "a really poor business decision." (Compl. at ¶ 65.)

Defendants fail to offer any substantial proof that Defendants possessed the requisite intent to deceive investors regarding the acquisition of Stargames. The Court cannot rely on Plaintiffs' stated assumptions that Defendants presumably knew "even before the acquisition closed" that the projected sales numbers for the Stargames acquisition were not attainable, or that Defendants purposely concealed these facts from investors. (Compl. at ¶ 67.)

The Complaint fails to allege contemporaneous facts in sufficient detail to create a strong inference that the alleged adverse facts were known to the Defendants at the time of the challenged statements. (See In re Vantive Corp. Securities Litigation, 283 F.3d 1079, 1085 (9th Cir. 2002). Even assuming that Defendants knew of Stargames' allegedly lower profit margins when the

8

statements were issued, there is no evidence to suggest that knowledge of Stargames' profit margins demonstrates Defendants knew their financial predictions were false. Plaintiffs do not provide any specific facts, documents, reports, or sources to show that Defendants had information contrary to what was projected in their press release statements. See In re Silicon Graphics, Inc., 183 F.3d at 985. Without such specifics, the Court cannot ascertain whether there is any basis to the allegations that Defendants had actual or constructive knowledge that the acquisition of Stargames indeed would not be modestly accretive, or produce the growth Defendants approximated.[1] For this reason, Plaintiffs' allegation of scienter in relation to the acquisition of Stargames fails independently.[2]

**B. Improper Accounting Practices**

Defendants also disclaim that Plaintiffs have demonstrated scienter as to Defendants alleged accounting fraud. Plaintiffs, in opposition, present three separate arguments which they believe demonstrate Defendants' scienter. Specifically, Plaintiffs allege Defendants' scienter is demonstrated holistically when considering (1) the nature and use of improper accounting practices; (2) the violations of various General Accepted Accounting Principles ("GAAP"); and (3) Individual Defendants' false certifications under the Sarbanes-Oxley Act ("SOA").

*1. Nature and Use of Improper Accounting Practices*

Plaintiffs allege that Defendants' scienter is demonstrated with respect to Shuffle Master's Year-End Inventory Transfers. Specifically, in early 2006, Shuffle Master disclosed in its delayed 2005 10-K that in two transactions involving its Casinos Austria Research & Development ("CARD") subsidiary, Shuffle Master had improperly recognized revenue in the fourth quarter of fiscal year 2005, resulting in the inflation of Shuffle Master's fourth quarter 2005 revenues by $728,000 and fourth quarter net income by $357,000.

---

[1] Because the Court finds that Plaintiffs have failed to demonstrate scienter regarding the Stargames acquisition, it finds discussion of whether the statements fall within the safe harbor provision not necessary here.

[2] Pursuant to Tellabs however, the Court may consider Defendants' allegations regarding the acquisition of Stargames in its ultimate determination of scienter. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. at 2502.

9

In January and February of 2006, Shuffle Master disclosed it had improperly booked revenue from the two transactions, but assured investors that the amount was "non-material" and that measures were being taken to prevent any recurrence of the accounting error. (Compl. at ¶ 53.) Specifically, Shuffle Master issued a press release on January 17, 2006, in which it stated that "[a]s a result of recognizing [the improper transaction] the Company is performing analysis to assure that there are no other similar transactions related to revenue recognition issues." (Compl. at ¶ 53.) Then, less than one year later, Shuffle Master made a similar error, again involving CARD, and again involving the improper accounting of a Year-End Inventory Transfer. Specifically, Shuffle Master improperly reported in its 2006 10-K, an inter-company profit of $1.211 million, which inflated its 2006 fourth quarter earnings by 43%, and its full-year earnings by 27%. (Compl. at ¶¶ 73–80.)

Plaintiffs allege that the improper accounting was part of a fraudulent scheme Defendants engaged in to artificially inflate the Company's earnings. Specifically, Plaintiffs allege that the timing of the errors is significant in demonstrating an inference of scienter, in that the 2005 transfer occurred in the fourth quarter, and the 2006 transfer occurred the very last day of the Company's 2006 fiscal year.

Defendants correctly argue that "a restatement alone cannot satisfy the scienter requirements". DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d385, 390–91 (9th Cir. 2002). Defendants also correctly assert that their previous disclosure creates a compelling inference against scienter because it indicates that Defendants fully disclose mistakes. (See Defs.' Mot. to Dismiss at 13 n. 9.) Defendants also aver that the disclosed errors in 2005 and 2006 are not comparable, stating that, "intra-company profit elimination is completely different from revenue recognition," and that fraud is not presumed when a company makes two accounting mistakes in consecutive years. (Defs.' Mot. to Dismiss at 12.)

The Court considers all of these arguments in its comparative evaluation of scienter.

### *2. GAAP Violations*

Plaintiffs provide evidence that Shuffle Master has admitted to various GAAP violations during and prior to the Class Period which may lend to a determination that Defendants posessed the requisite scienter under the PSLRA. Defendants correctly note that restatements and GAAP violations alone do not raise a strong inference of scienter; however, the Ninth Circuit has held that "significant violations of GAAP standards can provide evidence of scienter so long as they are pled with particularity." In re Daou Sys., Inc., 411 F.3d 1006, 1022 (9th Cir. 2005); In re McKesson HBOC, Inc., 126 F.Supp.2d 1248, 1273 (N.D. Cal. 2000) (holding that significant GAAP violations described with particularity may provide powerful indirect evidence of scienter).

In its Restated 2006 10-K, Shuffle Master acknowledged other accounting errors which were initially found to be immaterial. Specifically, the Company admitted that it had improperly classified "$430[,000] of amortization related to certain intangibles from research and development to Cost of Goods Sold." (Compl. at ¶ 92.) As a result of this improper accounting, along with other restatement adjustments, Shuffle Master's utility products segments operating margin was overstated by approximately 4.3%, and its total gross profit was overstated by approximately 2.3%. (Id.) The Restated 2006 10-K also conceded a failure to write off a $200,000 worthless receivable, which caused Shuffle Master to overstate its income by an additional $143,000. (Compl. at ¶ 95.) While these accounting errors were found by the Company's auditors to be immaterial independently, when combined with the other accounting errors listed in the Restated 2006 10-K, the errors inflated Shuffle Master's net income for the 2006 fiscal year by $1.7 million, or 33.6%, and net income for the fourth quarter of 2006 by 53.6%. (Compl. at ¶ 96.)

The Complaint alleges that but for the accounting errors, Shuffle Master would have "missed" its earnings guidance/consensus estimates to investors for the fourth quarter and a full year in which earnings were restated downwards, whereas the originally reported amounts caused the Company to apparently "meet" its [earnings] guidance. (See Compl. at ¶ 98.) Particularly, for the fourth quarter fiscal 2006, the accounting error allowed Shuffle Master to meet estimates of $0.19 a

11

share earnings, whereas without the accounting errors, Shuffle Master's earnings would have been only $0.14 a share.

Courts in other jurisdictions have held that the type, number, and amount of GAAP violations may be demonstrative of scienter. In this case, Planitiffs argue that Defendants GAAP violations particularly evince scienter because Defendants' violations involve the improper recognition of revenues before they were earned because they suggest a conscious decision to improperly recognize revenue. See In re Gilat Satellite Networks, Ltd., 2005 WL 2277476 at *20 (E.D.N.Y. Sept. 19, 2005); In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 231–32 (S.D.N.Y. 2006).

Plaintiffs also allege that the repetitive character and amount of GAAP violations may be indicative of scienter, See In re Network Associates, Inc., Securities Litigation, 2000 WL 33376577 at *9 (N.D. Cal. 2000). Here, while the Court does not find the number and amount of Defendants' accounting mistakes to be egregious, it does find that the similar circumstances of the Year-End transactions and the amount by which Shuffle Master's 2006 full year and fourth quarter 2006 net income increased due to the accounting errors by 33.6% and 53.6%, respectively, lend to an overall inference of scienter.[3]

### 3. False Certifications

Plaintiffs also aver that Yoseloff and Baldwin provided false and misleading certifications under Section 302 of the Sarbanes-Oxley Act ("SOA") that also give rise to a strong inference of scienter. Courts have found that certifications filed under the SOA may provide additional evidence of scienter if the certifications were false and misleading and the defendant knew that, or was deliberately reckless in issuing the certifications. See Weiss v. Amkor Tech., Inc., 527 F. Supp. 2d 938, 950 (D. Ariz. 2008); Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006) (SOA certification of accuracy of financial statements is probative of scienter if signatory "had

---

[3]Plaintiffs allege that Shuffle Master would have missed its consensus estimates by $0.05 per share were it not for the GAAP violations. (Compl. at ¶ 98.)

12

reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions")

Here Yoseloff and Baldwin each filed SOA certifications that stated they had properly designed, implemented, and supervised internal controls over financial reporting and disclosed any material weaknesses in such internal controls. (Compl. at ¶ 57.)  In its 2005 10-K, Shuffle Master admitted it had recognized revenue from transactions involving CARD that had inaccurately inflated its revenue and net income.  As part of its 2005 10-K, Shuffle Master acknowledged that its internal controls were deficient, and stated that it would implement a "Remediation Plan" that would be a "priority" in 2006, including additional finance and accounting staff trained in revenue recognition to correct the control deficiencies and monitor controls going forward. (Compl. at ¶¶ 57, 106.) Plaintiffs allege however, that Defendants never implemented the Remediation Plan nor the controls necessary to prevent the recurrence of the admittedly improper accounting practices.  In fact, in its Restated 2006 10-K, Defendants acknowledged continued internal control deficiencies, and that they lacked adequate resources in their accounting and finance departments, among other things.

The Court finds that given the filing of Shuffle Master's 2005 10-K, and indication that a Remediation Plan would be implemented to guard against further errors, as noted in Defendants' SOA certifications, together with the subsequent internal deficiencies discovered in conjunction to Shuffle Master's Restated 2006 10-K, there is sufficient reason to infer that Defendants acted with reckless disregard in failing to rectify its past internal deficiencies.

Overall, Defendants correctly argue that "a restatement alone cannot satisfy the scienter requirements", DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390–91 (9th Cir. 2002), and that temporal proximity on its own is insufficient to create a strong inference of scienter. See Renconi v. Larkin, 253 F.3d 423, 437 (9th Cir. 2001).  Here however, the Court does not make a presumption of fraud solely based on the fact that Defendants issued restatements, because of the temporal proximity of the errors, or because Defendants disclosed two accounting mistakes in two years.  The Court does however, find an inference of scienter when viewing the totality the specific

circumstances alleged regarding Defendants' improper accounting practices. Specifically, the Court finds that the nature of the accounting mistakes, the timing of the transfer and mistakes, that the mistakes involved the same subsidiary company, and that the mistakes allowed the Company's reported earnings to achieve consensus estimates, all demonstrate an inference of scienter that is at least as compelling as any opposing inference of nonfraudulent intent.

### C. Weaknesses in its Internal Controls

Plaintiffs also allege that Defendants misled investors as to the adequacy of Shuffle Master's internal controls. Particularly, in public statements and filings Defendants assured investors that the Company's internal controls were adequate. However, the Company's January 17, 2006, press release disclosed that the Company had engaged in mistaken revenue recognition. In its 2005 10-K, Shuffle Master acknowledged that it did not have appropriate internal controls specific to the recognition of revenue related to the identification and communication of non-standard transactions, yet stated that a Remediation Plan had been developed that would be a priority for the Company in 2006, including employing finance and accounting employees trained in revenue recognition to remediate the control deficiencies. (Compl. at ¶ 57.) Additionally, Yoseloff and Baldwin filed SOA certifications acknowledging that they had properly designed, implemented, and supervised internal controls over financial reporting and that they had disclosed any material weaknesses in such internal controls.

In its subsequent 2006 10-K Restatement however, Defendants acknowledge that internal control deficiencies still existed, and among other things, that Shuffle Master lacked adequate resources in their accounting and finance departments. In light of Defendants' 2005 10-K statement and Yoseloff and Baldwin's SOA certifications, the Court finds the continuing deficiencies acknowledged in Shuffle Master's restated 2006 10-K evinces scienter.

### D. Stock Sales

Plaintiffs also allege that the unusual nature of stock sales by Shuffle Master's officers during the Class Period provides additional circumstantial evidence of Defendants' scienter. Particularly,

1  Plaintiffs allege that the nature of the stock sales establishes that the Defendants were motivated to
2  commit fraud.

3   Suspicious stock sales may give rise to an inference of scienter.  See Nursing Home Pension
4  Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1232 (9th Cir. 2004).  To evaluate suspiciousness
5  of stock sales, the Ninth Circuit considers, *inter alia,* (1) the amount and percentage of shares sold;
6  (2) the timing of the sales; and (3) the consistency of the sales with prior trading history.  Id.
7  Additionally, "[s]tock trades are only suspicious when 'dramatically out of line with prior trading
8  practices at times calculated to maximize the personal benefit from the undisclosed inside
9  information." Id.

10  Defendants disclaim their stock sales evince scienter because the trades averred in the
11  Complaint are not suspicious when compared to previous stock sales, and because Dr. Yoseloff's
12  stock sales were made pursuant to a Rule 10b5-1 trading plan.  Plaintiffs allege that Yoseloff and
13  other Company insiders sold unusually large amounts of Shuffle Master stock during the Class
14  Period.  Particularly, Plaintiffs allege that during the Class Period, Yoseloff sold 300,853 shares,
15  grossing $8.56 million, constituting 38% of all shares Yoseloff owned at the beginning of the Class
16  Period.[4]  Additionally, Plaintiffs allege that Shuffle Master Senior Vice President Brooke Dunn sold
17  176,295 shares during the Class Period, representing 85% of the stock she owned or acquired during
18  the Class Period, and that Ernst Blaha, the Managing Director of the CARD subsidiary sold 12,000
19  shares during the Class period, representing 32% of his stock holdings.

20  Defendants oppose the manner in which Plaintiffs calculate the percentage of stock Yoseloff
21  sold.  Specifically, Defendants aver that Plaintiffs fail to account for Dr. Yoseloff's vested options,
22  which the Ninth Circuit considers when evaluating stock sales to determine scienter.  See In re
23  Vantive, 283 F.3d 1079, 1094 (9th Cir. 2002);  See also Copperstone v. TCSI Corp., 1999 WL

---

[4]Plaintiffs indicate that if the shares Yoseloff acquired during the class period are also calculated, Yoseloff sold 31% of the shares he owned or acquired during the Class Period. (Pls.' Resp. at 23.)

15

33295869 at *14 ("if stock sales are alleged to be evidence of scienter, the court must consider all of defendants' holdings, including vested options")).

According to Defendants, if considering all of Yoseloff's holdings, including vested options, Yoseloff only reduced his holdings in the Company by approximately 13%, which is insufficient to establish scienter.

Additionally, Defendants point out that Plaintiff has failed to demonstrate that Dr. Yoseloff's prior trading history during the Class Period is dramatically out of line with his prior trading practices. Specifically, Defendants allege that Yoseloff has a long history of selling stock. Defendants aver that in the 13 months directly preceding the alleged Class Period, Dr. Yoseloff sold "about as much stock as he did during the alleged Class Period (254,313 shares versus 300,858 shares)" and another 203,100 shares in the 13 months before that. (Defs.' Mot. to Dismiss at 20.)

Plaintiffs also allege that the timing of the stock sales during the Class period is suspicious and demonstrates Defendants' scienter. Particularly, Plaintiffs allege that by selling his stock at various times prior to drops in stock prices, Yoseloff "was able to sell a total of 300,583 shares at an average price of $28.46 (compared to the stock's current price below $5), garnering a total of $8.56 million." (Pls.' Resp. at 25.) The Court has examined Plaintiffs' arguments regarding stock sales, and does not find that Defendants' alleged "suspiciously-timed" stock sales independently give rise to an inference of scienter.

Additionally, Defendants argue that Dr. Yoseloff's stock sales fail to evince scienter because they were made pursuant to a 10b5-1 trading plan—which removes control of the sales from the Defendant, and puts it into the hands of a broker. Defendants argue that stock sales made pursuant to a 10b-5 plan, can be a strong competing inference against scienter. See Limantour v. Cray Inc., 432 F.Supp.2d 1129, 1151 n. 9 (W.D. Wash 2006). However, in opposition, Plaintiffs point out that SEC regulations require that a 10b5-1 plan specify the amount of securities to be sold, the date and price of the sales, or a formula for determining the amount, date and price, and that the plan was "entered

16

in good faith." 17 C.F.R. § 240.10b5-1(c)(l)(I). "Therefore, a 10b5-l trading plan does not provide an absolute defense to a claim of insider trading. Rather, it requires an additional factual finding of good faith. Not only can this Court not make such factual findings when considering a motion to dismiss, but this Court must also draw all inferences in favor of the non-moving party." In re Able Laboratories Securities Litigation, 2008 WL 1967509 at *27 n. 40 (D.N.J. March 24, 2008).

Therefore, here, the Court cannot, as Defendants suggest, infer from the fact that Defendant Yoseloff entered into a 10b5-1trading plan as a "strong competing inference against scienter."[5]

**IV. Conclusion**

Weighing all of the facts alleged collectively, the Court finds that Plaintiffs have alleged inferences that Defendants engaged in "knowing" or "intentional" conduct at least as compelling as any inference of Defendants' nonfraudulent intent. Specifically, the Court finds that Plaintiffs' evidence of Defendants' improper accounting procedures and misrepresentations regarding the weaknesses of Shuffle Master's inner controls create a strong inference of scienter on behalf of Defendants. Therefore, the Court finds that Plaintiffs have pled sufficient facts to allege scienter under the PSLRA.

Accordingly, **IT IS HEREBY ORDERED** that Defendants' Request for Judicial Notice (#72), and Defendants' Supplemental Request for Judicial Notice (#76), are **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss (#70) is **DENIED**.

**DATED** this 20th day of March 2009.

_____
Kent J. Dawson
United States District Judge

---

[5] The court notes that Defendant Yoseloff entered into the 10b5-1 trading plan on July 12, 2006, during the Class Period.

17