Richard A. Wright (Nev. Bar No. 0886)
Margaret M. Stanish (Nev. Bar No. 4057)
WRIGHT, STANISH & WINCKLER
300 South Fourth Street, Suite 701
Las Vegas, NV  89101
Tel:  (702) 382-4004

Jay W. Eisenhofer
Keith M. Fleischman
John C. Kairis
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017
Tel:  (646) 722-8500

*Counsel for Lead Plaintiffs City of Tulsa Municipal
Employees' Retirement Plan and Oklahoma Firefighters
Pension and Retirement System and the Proposed Class*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| *In Re Shuffle Master, Inc. Securities Litigation* | No. 2:07-cv-00715-KJD-RJJ |

## LEAD COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF
## AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

I.  INTRODUCTION ............................................................................................................1

II.  FACTUAL BACKGROUND ...........................................................................................2

III.  LEGAL ARGUMENT.......................................................................................................6

A.  A REASONABLE PERCENTAGE OF THE FUND RECOVERED IS THE
APPROPRIATE APPROACH TO AWARDING ATTORNEYS' FEES IN COMMON
FUND CASES, AND LEAD COUNSEL'S REQUESTED FEE MEETS THIS
CIRCUIT'S SIX-FACTOR TEST FOR DETERMINING WHETHER THE REQUESTED
PERCENTAGE FEE IS REASONABLE........................................................................7

1.  The Settlement Fund Established for the Class Through the Efforts
of Lead Counsel And the Favorable Reaction of the Class to this
Result Merit the Requested Fee .............................................................10

2.  The Effort Expended by Lead Counsel Merits the Requested Fee.........12

3.  By Virtue of Its Experience, Standing and Skill Applied In This
Litigation, Lead Counsel has Merited the Requested Fee .....................13

4.  The Magnitude and Complexity of this Litigation Support the Fee
Application..............................................................................................14

5.  Lead Counsel Assumed Significant Risk in Litigating this Action........15

6.  A Cross-Check Against Lead Counsel's Lodestar Demonstrates
that Lead Counsel's Fee Request is Reasonable....................................16

B.  THIS COURT SHOULD GRANT LEAD COUNSEL'S APPLICATION FOR
EXPENSES BECAUSE IT IS REASONABLE...............................................................17

C.  THIS COURT SHOULD AWARD THE CLAIMS ADMINISTRATOR ITS FEES ..............18

IV.  CONCLUSION................................................................................................................18

i

# TABLE OF AUTHORITIES

Page(s)

CASES

*Behrens v. Wometco Enters., Inc.*,
    118 F.R.D. 534 (S.D. Fla. 1988) ...................................................................................17

*Blum v. Stenson*,
    465 U.S. 886 (1984) ........................................................................................................8

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ........................................................................................................8

*Central R.R. & Banking Co. v. Pettus*,
    113 U.S. 116 (1885) ........................................................................................................8

*Edmonds v. United States*,
    658 F. Supp. 1126 (D.S.C. 1987) ..................................................................................12

*Fischel v. Equitable Life Assurance Soc'y of the U.S.*,
    307 F.3d 997 (9th Cir. 2002) ...........................................................................................9

*Gluck v. Cellstar*,
    976 F. Supp. 542 (N.D. Tex. 1997) ...............................................................................13

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .........................................................................................8

*Harris v. Marhoefer*,
    24 F.3d 16 (9th Cir. 1994) ........................................................................................7, 17

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ......................................................................................................10

*In re Activision Sec. Litig.*,
    723 F. Supp. 1373 (N.D. Cal. 1989) ...............................................................................9

*In re Corel Corp. Inc. Sec. Litig.*,
    293 F. Supp. 2d 484 (E.D. Pa. 2003) ............................................................................11

*In re Crazy Eddie Sec. Litig.*,
    824 F. Supp. 320 (E.D.N.Y. 1993) ...............................................................................11

*In re Gen. Instruments Sec. Litig.*,
    209 F. Supp. 2d 423 (E.D. Pa. 2001) ............................................................................12

*In re Heritage Bond Litig.*,
    No. 02-ml-1475, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ................................. *passim*

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
    194 F.R.D. 166 (E.D. Pa. 2000).......................................................................................12

*In re InfoSpace, Inc. Securities Litig.*,
    330 F. Supp. 2d 1203 (W.D. Wash. 2004).........................................................................17

*In re Linerboard Antitrust Litig.*,
    No. mdl 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004).................................................17

*In re Lucent Tech. Inc. Sec. Litig.*,
    327 F. Supp. 2d 426 (D.N.J. 2004) ...................................................................................11

*In re Med. X-Ray Film Antitrust Litig.*,
    No. 93-cv-5904, 1998 WL 661515 (E.D.N.Y. Aug. 7, 1998) .............................................11

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) .............................................................................................11

*In re Portal Software, Inc.*, *Sec. Litig.*,
    No. 03-cv-5138, 2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) ....................................9, 16

*In re Public Serv. Co. of New Mexico*,
    No. 91-cv-0536, 1992 WL 278452 (S.D. Cal. July 28, 1992).......................................11, 13

*In re Ravisent Tech., Inc. Sec. Litig.*,
    No. 00-cv-1014, 2005 WL 906361 (E.D. Pa. Apr. 18, 2005).............................................11

*In re Sumimoto Copper Litig.*
    74 F. Supp. 2d 393 (S.D.N.Y. 1999)..................................................................................17

*Maley v. Del. Global Techs. Corp.*,
    186 F. Supp. 2d 385 (S.D.N.Y. 2002)................................................................................12

*Six Mexican Workers v. Ariz. Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) ........................................................................................8, 9

*Torrisi v. Tucson Elec. Power Co.*
    8 F.3d 1370 (9th Cir. 1993) ...........................................................................................9, 15

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ..............................................................................7, 8, 9, 16

**STATUTES**

15 U.S.C. § 78u-4(a)(6) ..................................................................................................8, 17

**OTHER AUTHORITIES**

John C. Coffee, Jr.,*Understanding the Plaintiff's Attorney: The Implications of Economic
    Theory for Private Enforcement of the Law Through Class and Derivative Actions*, 86
    COLUM. L. REV. 669 (1986)...............................................................................................8

## I.   INTRODUCTION

As set forth in Lead Plaintiffs' Memorandum of Law in Support of Motion for Final Approval Settlement ("Settlement Approval Brief"), after more than two years of litigation, including intensive investigation by Lead Counsel, consultation with financial experts, and negotiations and mediation, the parties have reached a settlement ("Settlement") that resolves this class action ("Action") against all Defendants.[1]  As set forth in the Class Action Stipulation of Settlement dated January 31, 2010 ("Settlement Agreement"), Lead Counsel have obtained an all-cash Settlement of $13 million (the "Settlement Fund").

For their efforts, Lead Counsel seek an award of 18 percent of the $13 million Settlement Fund ($2,340,000), plus $606,935.50 in expenses (plus interest on the award at the same rate and for the same period as that earned on the Settlement Fund).  As set forth below, the amount requested is fair and reasonable and should be approved.

The significance of the $13 million Settlement is demonstrated by the Class' reaction to it:  to date, not a single investor has filed an objection, and only a handful have opted out.  The Settlement also represents a 14 percent recovery of the Class' estimated net loss.  Comparable results have merited the approbation of the courts of this Circuit, and class counsel in such cases are routinely awarded fees in excess of 30 percent of the class' recovery, an amount far greater than Lead Counsel is requesting in this case.

The Settlement is a significant victory for the Class.  This case presented highly complex accounting issues, the exact nature of which became clear only after a substantial investment of time, effort, and resources on the part of Lead Counsel.  Lead Counsel retained numerous experts, and consulted several confidential witnesses in an effort to advance this litigation for the Class' benefit.  Lead Counsel drafted an extensive complaint, successfully defended against a dispositive motion, and engaged in discovery, all with the aim of ensuring that the Class would receive the highest possible recovery under the circumstances.

---

[1] Lead Plaintiffs are the City of Tulsa Municipal Employees Retirement Plan and the Oklahoma Firefighters Pension and Retirement System.  Lead Counsel is Grant & Eisenhofer P.A.  The Defendants are Shuffle Master, Inc. ("Shuffle Master" or the "Company"), Mark Yoseloff ("Yoseloff") and Richard L. Baldwin ("Baldwin") (collectively, "Defendants").

While doing their utmost to vigorously advance the interests of the Class, Lead Counsel litigated this case on an entirely contingent fee basis, bearing the cost of every expense as it arose.   Collectively, Lead Counsel advanced $1,258,193.50 in professional time and $606,935.50 in expenses, all the while assuming the risk of non-payment.

In view of Lead Counsel's diligence, the benefits their efforts conferred on the Class, and risks they bore in stewarding this case, Lead Counsel's requested fee is reasonable and its application should be granted.   Lead Counsel's requested fee of 18 percent of the Settlement Fund falls well below both the Ninth Circuit's 25 percent "benchmark" fee and the 33 percent fee typically awarded to class counsel who achieve results comparable to those achieved here. Indeed, Lead Counsel's requested fee represents only a 1.8 multiplier against its lodestar.  By comparison, lodestar multipliers awarded in common fund cases, in this Circuit and elsewhere, are typically in the range of 3x -4.5x.

Accordingly, this Court should find that Lead Counsel's requested fee is reasonable and should grant their application.

## II.    FACTUAL BACKGROUND

On November 30, 2007, the Court appointed G&E as Lead Counsel in this Action. Upon appointment as Lead Counsel, G&E began to research and investigate the claims of the Class by reviewing the Securities and Exchange Commission ("SEC") filings made by Shuffle Master over a period of several years preceding March 2007, and the numerous analyst reports and news articles concerning Shuffle Master published during that same period.  Kairis Decl. ¶ 3.[2]  G&E retained a private investigator to identify, find and interview individuals who were formerly employed by Shuffle Master or companies that had been acquired by Shuffle Master, with the goal of obtaining an "insider's perspective" and related information regarding any improper accounting and fraudulent practices at Shuffle Master that may have occurred.  G&E also retained the assistance of a forensic accounting expert, Penn Consulting Group, to assist with a forensic review of Shuffle Master's financial statements.   G&E worked with its

---

[2] Declaration of John C. Kairis, dated June 1, 2010 and being filed herewith ("Kairis Decl.").

accounting expert, reviewed reports from its investigator, and performed legal research regarding the Class's claims. *Id*.

Based upon all of this factual investigation and legal research, G&E drafted the 79-page Consolidated Class Action Complaint (the "Complaint"). *Id*. ¶ 4. On February 5, 2008, Lead Plaintiffs filed the Complaint alleging, among other things, that Defendants made false and misleading statements to investors and engaged in accounting fraud in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated by the SEC. *Id*. The Complaint included information obtained from several of the confidential witnesses interviewed by the private investigator hired by G&E. *Id*. The Complaint also explained in detail each aspect of the fraud, including an explanation of the improper transactions, a presentation of the applicable Generally Accepted Accounting Principles ("GAAP") and a discussion of why each of the GAAP provisions (and related SEC regulations) had been violated. *Id*.

In the Complaint, Lead Plaintiffs alleged that Defendants improperly recognized revenue from inter-company transactions, engaged in improper accounting practices and manipulated and misrepresented the Company's financial results. *Id*. ¶ 5. Lead Plaintiffs also alleged that Defendants misrepresented the progress of the Company's integration of an Australian Company called Stargames acquired by Shuffle Master in 2005, and made false statements that certain weaknesses in internal accounting controls would be examined and corrected. *Id*. Lead Plaintiffs also detailed sales of Shuffle Master stock by the Individual Defendants and other Company insiders as further evidence of Defendants' scienter. *Id*.

On March 25, 2008, Defendants moved to dismiss the Complaint and on March 23, 2009, the Court issued an Order denying most of Defendants' motion. The Court upheld Lead Plaintiffs' claims regarding certain of Defendants' improper accounting practices, ruling that "the similar circumstances of the Year-End transactions and the amount by which Shuffle Master's 2006 full year and fourth quarter 2006 net income increased due to the accounting errors by 33.6% and 53.6%, respectively, lend to an overall inference of scienter." Order at 12. The Court also upheld Lead Plaintiffs' claims regarding Defendants' alleged misrepresentations

regarding Shuffle Master's internal controls,  ruling that "Plaintiffs' evidence of Defendants' improper accounting procedures and misrepresentations regarding the weaknesses of Shuffle Master's inner controls create a strong inference of scienter on behalf of Defendants."  Order at 17.

On April 29, 2009, Defendants filed an Answer to the Complaint, and the parties then began to negotiate a proposed discovery plan pursuant to the local rules of the Court.  Kairis Decl. ¶ 9.  During this process, Defendants suggested that the parties engage in mediation and Lead Plaintiffs agreed.  The parties agreed to a mediation of the Action before the Honorable Layn R. Phillips (Retired).  *Id.*  For purposes of the mediation, Defendants agreed to provide Lead Plaintiffs with certain discovery, including an investigative report conducted by a Shuffle Master special committee into certain matters alleged in the Complaint.  *Id.* ¶ 10.

Beginning in July 2009, Defendants produced more than 88,000 pages of documents that were pertinent to Lead Plaintiffs' claims and could be used in the upcoming mediation.  *Id.* ¶ 11.  These documents were produced pursuant to a Stipulation and Proposed Protective Order, negotiated by Lead Counsel and Defendants' counsel and filed with the Court on July 7, 2009, and Ordered by the Court on July 23, 2009.  *Id.*  G&E attorneys immediately commenced a detailed review and analysis of these documents.  *Id.* ¶ 12.

G&E retained Penn Consulting Group to conduct a forensic review of the documents and to assist with G&E's analysis.  *Id.*  In addition, G&E retained Dubin Research & Consulting, Inc. to analyze all relevant documents and prepare a presentation for the mediation that included: a chronology of each of the improper transactions, based upon key documents identified from Defendants' document production; an analysis of the material misstatements made by Defendants; an analysis of the applicable GAAP provisions and how each one was violated; an analysis of the Defendants' and other insiders' trades in the stock of Shuffle Master that supported the inference of scienter; and a presentation of the damages suffered by the Class.  *Id.* ¶13.  Based on all of this analysis and review, G&E prepared a detailed mediation statement for Judge Phillips.  *Id.*

On August 4, 2009, the parties conducted a one-day mediation before Judge Phillips. *Id*. Representatives of the Lead Plaintiffs and Lead Counsel traveled to and participated in the mediation. *Id.* Although the mediation did not result in a settlement, Judge Phillips continued to separately work with the parties to obtain a resolution. *Id*. ¶14. In the meantime, Lead Plaintiffs served Defendants with their First Request For Production of Documents (containing 45 separate requests), as well as subpoenas for the production of documents on various third parties, including Shuffle Master's auditor, Deloitte & Touche LLP. *Id.* Defendants also served requests for documents on each of the Lead Plaintiffs, in response to which Lead Plaintiffs and Lead Counsel prepared responses and culled and reviewed the relevant documents for production. *Id.*

In October 2009, as a result of further negotiations and the continued efforts of Judge Phillips, the parties were able to reach a settlement (the "Settlement"). *Id*. ¶ 15. Under the Settlement, Defendants agreed to settle the claims alleged by the Class in the Action for $13 million. Lead Plaintiffs and Lead Counsel each believed this was the best result that could be achieved. *Id.*

Among other reasons, Defendants have consistently denied any wrongdoing; have steadfastly asserted that the accounting issues raised in Lead Plaintiffs' Complaint were the result of mere inadvertence, as opposed to deliberate fraud; and have consistently asserted that Lead Plaintiffs cannot establish scienter. *Id*. ¶ 16. In addition, Defendants provided to Lead Counsel at the mediation information about Shuffle Master's total director's and officer's liability insurance coverage, as well as the portion of that insurance coverage that had already been expended on defense costs. *Id.* Lead Counsel understood that, if the litigation were to continue – which could take years through trial and any appeals – defense costs would continue to erode the remaining available insurance coverage, and the $13,000,000 that is being paid in the Settlement would be substantially, if not completely, depleted. *Id.* In short, Lead Plaintiffs and Lead Counsel believed, and continue to believe, that the Settlement was reasonable when weighing the potential benefits of a favorable result at trial, discounted for the risks associated with continued litigation. *Id.*

After the Settlement was agreed to in principle, between October 2009 and January 2010, G&E negotiated and drafted the "Settlement Agreement." *Id.* ¶ 17.  G&E also drafted the Motion for Preliminary Approval of the Settlement and all the supporting papers, including the supporting memorandum of law, the summary and detailed class notices to be disseminated to the Class, and the proof of claim form, and retained Gilardi & Co, Inc. as the claims administrator (the "Claims Administrator") to assist in the publication and dissemination of notices, processing of Claims and distribution of Settlement funds to Class members.  *Id.*

G&E also retained a damages expert, the Philadelphia Investment Banking Company, to determine an appropriate plan of allocation for the Settlement funds, consistent with the allegations of the Complaint (the "Plan of Allocation").  *Id.* ¶ 18.  This Plan of Allocation distributes the net Settlement proceeds based on the estimated amount by which Shuffle Master's stock price was artificially inflated during various time periods as a result of the fraud alleged in the Complaint.  *Id.*

On February 2, 2010, G&E filed the motion for preliminary approval.  On February 4, 2010, the Court entered an Order of Preliminary Approval of Settlement, Establishing Notice Procedures and Providing Notice of Final Fairness Hearing (the "Preliminary Approval Order").  Subsequent to the entry of the Preliminary Approval Order, and under the supervision of G&E, the Claims Administrator proceeded to publish and disseminate the required notices to the Class.  *See* Affidavit of Michael Joaquin ("Joaquin Aff.") filed separately.  As of the date of this filing, Lead Counsel has not received any objections to the Settlement.  Kairis Decl. ¶ 20. Furthermore, only 8 Class members (from a total estimated number of over forty-three thousand Class members) have elected to opt out of the Class.  Joaquin Aff. ¶ 13.

## III.    LEGAL ARGUMENT

Lead Plaintiffs respectfully request that the Court approve Lead Counsel's requests for attorneys' fees, expenses, and the Claims Administrator's fees to be paid from the Settlement Fund because each of these requests is reasonable.

Lead Counsel requests an award of attorneys' fees of 18 percent of the Settlement Fund, an amount to which Lead Plaintiffs agreed prior to the commencement of this Action.  The

requested fee meets the Ninth Circuit's six-factor test for determining whether a requested percentage fee is reasonable. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002). Here, that test is satisfied because (1) the requested fee falls below both this Circuit's 25 percent "benchmark" award and awards typically granted in cases involving analogous settlements; (2) Lead Counsel expended significant effort in connection with the litigation; (3) Lead Counsel is highly experienced and skilled; (4) the litigation presented several complex issues; (5) Lead Counsel assumed a significant risk of non-payment; and (6) a cross-check against Lead Counsel's conservative lodestar demonstrates that its fee request is modest.

Second, Lead Plaintiffs also respectfully request that this Court approve Lead Counsel's request for expenses because each of these expenses is reasonable and "'would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (citation omitted). Each expense for which reimbursement is requested was necessarily incurred in furtherance of this litigation.

Third, Lead Plaintiffs respectfully request that this Court approve the Claims Administrator's requested fee because the requested fees are reasonable, are in line with rates charged by the Claims Administrator in similar class actions, and have not been met with any objection from the Class.

**A.   A REASONABLE PERCENTAGE OF THE FUND RECOVERED IS THE APPROPRIATE APPROACH TO AWARDING ATTORNEYS' FEES IN COMMON FUND CASES, AND LEAD COUNSEL'S REQUESTED FEE MEETS THIS CIRCUIT'S SIX-FACTOR TEST FOR DETERMINING WHETHER THE REQUESTED PERCENTAGE FEE IS REASONABLE**

For their efforts on behalf of the Settlement Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis. The percentage approach is the appropriate method for determining Lead Counsel's fee because it aligns class counsel's interest in being paid a fair fee with the interest of the class in achieving the maximum recovery for the class in the shortest amount of time required under the circumstances, which is what occurred here. Fee awards representing a percentage of the fund recovered have become an

accepted method for awarding attorneys' fees in common fund cases in this Circuit and throughout the United States.

It has long been recognized that an attorney who recovers a common fund for the benefit of a class is entitled to recover attorneys' fees and expenses payable from the fund. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-79 (1980) (approving award of attorneys' fees as proper application of common fund doctrine). This rule, known as the common fund doctrine, is firmly rooted in American case law. *See, e.g., Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885). Indeed, in *Blum v. Stenson*, the Supreme Court stated that the percentage method of computing fees was the proper approach in the "common fund" context where, as here, the fees are paid out of (not in addition to) the fund recovered:

> Unlike the calculation of attorney's fees under the "common fund doctrine," where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation.

465 U.S. 886, 900 n.16 (1984); *see also Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (awarding fees in common fund case). This doctrine is rooted in "the traditional practice in courts of equity," and prevents the unjust enrichment of recovering class members by ensuring that all who benefit from litigation pursued on their behalf contribute to its expense. *Boeing*, 444 U.S. at 478.

In this Circuit, district courts use the "percentage-of-the-fund" method to calculate reasonable attorneys' fees in common fund cases. *See Vizcaino* 290 F.3d at 1050 (noting that the percentage method is the "primary basis of the fee award"). Under this approach, the court simply awards counsel fees in an amount that is a percentage of the class' recovery. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998).[3] In applying the percentage approach, the Ninth Circuit has established a "benchmark" award for attorneys' fees in common fund

---

[3] The PSLRA provides support for the percentage method, stating that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. § 78u-4(a)(6). Professor Coffee argues that a percentage of the gross recovery is the *only* reasonable method of awarding fees in common fund cases. *See* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of the Law Through Class and Derivative Actions*, 86 COLUM. L. REV. 669, 724-25 (1986).

1  cases of 25 percent of the recovery.  *Torrisi v. Tucson Elec. Power Co.* 8 F.3d 1370, 1376 (9th

2  Cir. 1993); *Six Mexican Workers*, 904 F.2d at 1311.[4]

3        Courts have the discretion to also employ a "lodestar" method in determining the

4  amount of fees to award.  *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997,

5  1006 (9th Cir. 2002).  The lodestar method calls for an assessment of counsel's reasonable

6  hours billed and multiplies that figure by a reasonable hourly rate.  *In re Portal Software, Inc.*,

7  *Sec. Litig.*, No. 03-cv-5138, 2007 WL 4171201, at *14 (N.D. Cal. Nov. 26, 2007).  In practice,

8  courts use the lodestar method as a means to assess whether the percentage should be adjusted,

9  or simply as a cross-check on the reasonableness of the fee award.  As explained in *Six*

10  *Mexican Workers*, the benchmark award "should be adjusted, or replaced by a lodestar

11  calculation, when special circumstances indicate that the percentage recovery would be either

12  too small or too large in light of the hours devoted to the case or other relevant factors."  904

13  F.3d at 1311.

14        Courts in the Ninth Circuit look to the following factors to determine whether the

15  benchmark percentage should be adjusted up or down: (1) the result obtained for the class; (2)

16  the effort expended by counsel; (3) counsel's experience and skill; (4) the complexity of the

17  issues; (5) the risk of non-payment assumed by counsel; and (6) a cross-check against counsel's

18  lodestar figure.  *See Vizcaino*, 290 F.3d at 1048-50; *Six Mexican Workers*, 904 F.2d at 1311; *In*

19  *re Portal Software*, 2007 WL 4171201, at *13; *In re Heritage Bond Litig.*, 2005 WL 1594403,

20  at *18.  In performing the lodestar cross-check, courts weigh not only the reasonableness of

21  counsel's billed hours and hourly rate, but also the reasonableness of a multiplier computed

22  from the ratio of the proposed percentage fee to the computed lodestar fee.  *In re Portal*

23  *Software*, 2007 WL 4171201, at *14.  This additional multiplier compensates counsel for

24  "various factors," including unusual skill or experience of counsel, or the *ex ante* risk of no

25  recovery.  *Id.*

26

27  ───────────────
   [4] Indeed, in view of the number of cases where courts have approved awards of 30 percent or more of the class'
   recovery, a number of courts in this Circuit have observed that the "better practice" would be to set the benchmark

28  at 30 percent, rather than 25.  *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1377-78 (N.D. Cal. 1989); *In re
   Heritage Bond Litig.*, No. 02-ml-1475, 2005 WL 1594403, at *18 n.12 (C.D. Cal. June 10, 2005).

As shown below, application of each of the six factors discussed above demonstrates that Lead Counsel's proposed fee of 18 percent of the Class' $13 million recovery, or $2,340,000, is eminently reasonable.  First, a review of the fees awarded in cases achieving a result comparable to the one achieved by Lead Counsel (a recovery of approximately 14 percent of claimed damages) indicates that Lead Counsel's requested fee is on the low end of such awards.  Second, Lead Counsel expended considerable effort in connection with this litigation by, among other things: drafting a comprehensive complaint supported by eleven months of legal and factual research; successfully defending Defendants' motion to dismiss; engaging in discovery and analyzing and reviewing numerous documents produced by Defendants; presenting the merits of Lead Plaintiffs' claims at mediation; and successfully negotiating a sizeable recovery on behalf of the Class.  Third, as one of the leading securities class action law firms in the nation, Lead Counsel's standing and expertise, and the effort Lead Counsel expended in this litigation, merit the requested fee award.  Fourth, this litigation presented complex issues, the resolution of which required Lead Counsel to consult with financial experts and expend substantial amounts of time and resources.  Fifth, Lead Counsel advanced $1,258,193.50 in professional time and $606,935.50 in expenses, all while assuming the risk of non-payment.  Finally, in view of the nature of the present litigation and of Lead Counsel's considerable expertise in the matters litigated before this Court, Lead Counsel's lodestar is modest and its proposed 1.8 multiplier falls well below the mean range of multipliers awarded in common fund litigation in this Circuit.  Thus, all of the factors support approval of Lead Counsel's request for fees and reimbursement of expenses.

### 1. The Settlement Fund Established for the Class Through the Efforts of Lead Counsel And the Favorable Reaction of the Class to this Result Merit the Requested Fee

The significant result achieved by Lead Counsel in this case supports its fee request.  Courts have consistently recognized that the result achieved is a major factor to be considered in awarding attorneys' fees.  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("[T]he most critical factor is the degree of success obtained").  As set forth in the Settlement Approval Brief, the $13 million all cash recovery represents 14 percent of the maximum estimate of the

1  Class's losses, while the average recovery in comparable cases is only 5.1 percent of investor

2  losses.  *See* Settlement Approval Brief at 8.  Thus, the benefit obtained by Lead Counsel is

3  significant (almost three times the average).

4      The reaction of the Class further supports Lead Counsel's fee request.  As set forth in

5  the Kairis declaration at paragraph 20, following a widespread notice program, there have been

6  only 8 class members who have opted out of the Settlement, and none have objected either to

7  the Settlement or to Lead Counsel's fee request.  This reaction by the Class fully supports the

8  requested fee award.  *See In re Lucent Tech Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 435 (D.N.J.

9  2004) (lack of significant objections was "strong evidence" of reasonableness of fee request).

10      Moreover, Lead Counsel's fee request is reasonable because the proposed fee of 18

11  percent of the recovery is well below both the 25 percent benchmark and the 33 percent fee

12  typically awarded for results comparable to those achieved by Lead Counsel in this case.

13  Indeed, in cases of comparable recovery, courts in this Circuit have *increased* the 25 percent

14  benchmark to 33 percent.  *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 457-58

15  (9th Cir. 2000) (affirming an award of one third of the settlement fund where counsel recovered

16  approximately 16 percent of the class' net loss); *In re Public Serv. Co. of New Mexico*, No. 91-

17  cv-0536, 1992 WL 278452, at **2, 7, 12 (S.D. Cal. July 28, 1992) (awarding one third of the

18  gross settlement fund where counsel recovered approximately 16 percent of the class' net loss,

19  a result the court characterized as "excellent").  Courts in other jurisdictions have similarly

20  awarded fees of one third of the settlement fund or more where class counsel achieved results

21  comparable to those obtained here.  *See, e.g., In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320,

22  326 (E.D.N.Y. 1993) (increasing 25 percent benchmark to 33.8 percent where counsel

23  recovered 10 percent of damages); *In re Med. X-Ray Film Antitrust Litig.*, No. 93-cv-5904,

24  1998 WL 661515, at **7-8 (E.D.N.Y. Aug. 7, 1998) (increasing 25 percent benchmark to 33

25  percent  where counsel recovered 17 percent of the class' total loss); *In re Ravisent Tech., Inc.

26  Sec. Litig.*, No. 00-cv-1014, 2005 WL 906361, at **1, 9-10 (E.D. Pa. Apr. 18, 2005) (awarding

27  one third of settlement fund where counsel recovered 12 percent of the class' total loss); *In re

28  Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d  484, 489-90, 92 (E.D. Pa. 2003) (awarding one

third of settlement fund where counsel recovered approximately 11 percent of the class' total loss); *In re Gen. Instruments Sec. Litig.*, 209 F. Supp. 2d 423, 431, 434 (E.D. Pa. 2001) (awarding one third of settlement fund where counsel recovered approximately 11 percent of the class' total loss).

Because the attorneys' fee normally awarded to class counsel in cases of comparable class recovery far exceeds Lead Counsel's requested fee, this Court should find that Lead Counsel's requested fee is reasonable and grant its application.

### 2.    The Effort Expended by Lead Counsel Merits the Requested Fee

The second factor considered by the courts in determining the appropriate percentage fee to award also supports granting Lead Counsel's fee request.   Lead Counsel expended significant effort in vigorously litigating, settling, and managing this case for over two years. Lead Counsel obtained the Settlement solely through its own efforts and without the assistance of any regulatory agency or the necessity of a lengthy trial or post-trial appeal.   This favorable Settlement, through the efforts of Lead Counsel (as detailed in the Kairis Declaration), represents an excellent result for the Class.

Courts have long recognized that prosecuting complex national class actions, such as the present case, requires "unique legal skills and abilities."   *Edmonds v. United States*, 658 F. Supp. 1126, 1137 (D.S.C. 1987).   *See also Maley v. Del Global Techs Corp.*, 186 F. Supp. 2d 358, 372 (S.D.N.Y. 2002) (a securities case "by its very nature, is a complex animal") (citations and internal quotations omitted); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("[S]ecurities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA.").   Lead Counsel drafted an 79 page, 207 paragraph complaint supported by eleven months of investigation, including extensive legal research, consultation with numerous experts, and interviews with confidential witnesses Lead Counsel procured through its own diligence and ingenuity.   Lead Counsel successfully opposed Defendants' motion to dismiss this action by developing pertinent, persuasive facts and researching and presenting applicable accounting and legal principles.   Lead Counsel also reviewed and analyzed thousands of pages of discovery produced by Shuffle Master, engaged

in extensive negotiations with opposing counsel, and prepared detailed mediation statements, presented the strengths of Lead Plaintiffs' claims at the mediation, and engaged in subsequent negotiations.

In all, Lead Counsel billed over 2,000 hours in connection with this litigation and advanced over $1.2 million in professional time and over $600,000 in expenses, mostly to cover the cost of experts and consultants. Lead Counsel devoted significant resources to zealously advancing and guarding the rights of the Class and, therefore, have more than earned the requested fee.

### 3. By Virtue of Its Experience, Standing and Skill Applied In This Litigation, Lead Counsel has Merited the Requested Fee

Lead Counsel's expertise and standing, as well as the skill with which it litigated this case, also justify the requested attorneys' fee award. Lead Counsel did not learn on the job – it has extensive experience representing plaintiffs in securities class actions. Indeed, after the enactment of the PSLRA, Lead Counsel achieved national recognition in representing institutional investors, particularly public employee pension funds, in federal securities fraud and related litigation. The firm was the first to utilize the provisions of the PSLRA allowing an institutional investor to be appointed as lead plaintiff in a securities class action, *see Gluck v. Cellstar Corp.*, 976 F. Supp. 542, 546-47 (N.D. Tex. 1997), and it has been lead counsel in some of the largest securities class actions in history, including *In re Tyco International, Ltd., Securities Litigation*, where it obtained a $3.2 billion total settlement, and *In re Global Crossing Ltd. Securities Litigation*, where it obtained a $448 million settlement.

Lead Counsel has been named as one of the nation's top plaintiffs firms by The National Law Journal in the annual "Plaintiffs' Hot List" Hall of Fame. In 2007 and 2009 (2009 figures have not been released), Risk Metrics Group cited Lead Counsel for winning the highest average investor recovery in securities class actions of any law firm in the United States, and the firm was recently listed among the Plaintiffs Securities Firms of the Year by Law 360. These facts all support granting Lead Counsel's fee request. *See Heritage*, 2005 WL 1594403, at *20; *In re Public Service Co.*, 1992 WL 278452, at *9 (taking into account class

counsel's "great professional skill" and "extensive experience in class action and other complex litigation" in ruling that a one third percentage fee award was appropriate).

Moreover, in this litigation, Lead Counsel was opposed by highly skilled and well-respected counsel in the law firms of Paul, Hastings, Janovsky & Walker LLP and Jones Vargas.  This fact also supports Lead Counsel's fee request.  *See Heritage*, 2005 WL 1594403, at \*20 (taking into account the skill and reputation of opposing counsel in ruling that a one third fee was appropriate).

In light of the skill, experience, and standing of Lead Counsel, all of which it brought to bear in this litigation, as well as the skill and competence of opposing counsel, this Court should find that Lead Counsel's requested fee is reasonable and grant its application.

### 4.    The Magnitude and Complexity of this Litigation Support the Fee Application

Lead Counsel dedicated substantial resources to analyzing and synthesizing the complex accounting transactions that formed the foundation of the Class' claims and, in view of the case's complexity, Lead Counsel's requested fee is reasonable.  Courts have long recognized that the greater the factual or legal complexity associated with a particular common fund case, the greater the risks and contingencies borne by the attorneys prosecuting it on behalf of the class.  *See, e.g.*, *Heritage*, 2005 WL 1594403, at \*20 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 718 (5th Cir. 1974)).

At the outset of this litigation, both the exact contours of Defendants' accounting methodology and the actionable nature of such protocols were uncertain.  As a direct consequence of Lead Counsel's comprehensive and exhaustive investigation, the Complaint filed on behalf of the Class articulated precise GAAP violations, detailed specific transactions and set forth the particular standards they violated.  In particular, Lead Counsel recruited experts and consulted several confidential witnesses in order to describe several instances where inter-company transfers were improperly booked as revenue, and others where revenues and gains from transactions were realized up front, in violation of applicable accounting rules.

Accordingly, the complexity of this case weighs in favor of the reasonableness of Lead Counsel's requested fee.

### 5.    Lead Counsel Assumed Significant Risk in Litigating this Action

Lead Counsel advanced significant professional and monetary resources over the course of the two years it litigated this case, all while assuming a significant risk of non-recovery. Shouldering the financial burdens and risks of the suit while diligently litigating it in the best interests of the class ordinarily entitles class counsel to a significant fee under Ninth Circuit law. *Torrisi*, 8 F.3d at 1377.  In awarding class counsel a 25 percent fee, the Ninth Circuit observed in *Torrisi* that the fee "rewarded class counsel not only for the hours they had in the case to the date of the settlement, but for carrying the financial burden of the case, effectively prosecuting it and, by reason of their expert handling of the case, achieving a just settlement for the class." *Id*.

The Class' claims in this case arose primarily from complex accounting transactions. Proving that these transactions were not properly reported pursuant applicable law and regulations, and that Shuffle Master's accounting methodology violated applicable GAAP provisions, was not only a risky proposition, but an expensive one as well.  Lead Counsel advanced several hundred thousand dollars in expert fees alone in an effort to fully articulate the nature of the improper accounting practices and the full extent of the alleged fraud. Moreover, as Defendants' motion to dismiss demonstrates, recovery was far from certain. Establishing the element of scienter was difficult and depended entirely on Lead Counsel's ability to coherently marshal its extensive factual investigation in support of its claim that Defendants knew or recklessly disregarded the misleading nature of the misstatements enumerated in the Complaint.  Among other facts, Lead Counsel obtained the testimony of numerous confidential witnesses who provided a unique insider perspective on Defendants' alleged wrongdoing.

Despite the significant risk involved in litigating this Action, Lead Counsel never wavered in its efforts to obtain the optimum recovery on behalf of the Class.  Collectively, Lead Counsel advanced $1,258,193.50 in professional time and $606,935.50 in expenses, for a

total advancement of $1,865,129.00 made for the benefit of the Class.  This sum was advanced on an entirely contingent basis: expenses were paid as they arose and, for two years, Lead Counsel has received no remuneration whatsoever.  The only things that were certain from the outset of this litigation was that Lead Counsel would receive no fee unless it was successful, and that success would not be achieved without great effort and expense.  Accordingly, Lead Counsel's assumption of the risk in this litigation merits a reasonable share of its rewards.

### 6.    A Cross-Check Against Lead Counsel's Lodestar Demonstrates that Lead Counsel's Fee Request is Reasonable

A cross-check of Lead Counsel's proposed percentage against its lodestar reveals that Lead Counsel has requested a multiplier of only 1.8, a multiplier that falls among the smaller awards typically granted in common fund cases.  A court may use the lodestar calculation as a check on the reasonableness of the requested percentage, and to assist the court in determining whether the percentage fee should be adjusted up or down.  *Vizcaino*, 290 F.3d at 1050 ("Thus, while the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award.").  "Three figures are salient in a lodestar calculation: (1) counsel's reasonable hours, (2) counsel's reasonable hourly rate and (3) a multiplier thought to compensate for various factors." *In re Portal Software*, 2007 WL 4171201, at *14 (citation omitted).  All three of these figures submitted by Lead Counsel are reasonable and support a ruling granting its fee application.

Lead Counsel's lodestar included 2,095.8 hours over two years in connection with this litigation.  In view of the complexity of this case and the myriad tasks performed by Lead Counsel, the number of hours billed is reasonable.  Moreover, Lead Counsel's hourly rate is reasonable.  In particular, Lead Counsel has economically allocated the work within its firm, apportioning significant amounts of work to less expensive counsel where appropriate in an effort to create as large a recovery for the Class as possible.

Lead Counsel's requested multiplier is also reasonable.  In securities class actions, it is common for counsel's lodestar to be adjusted upward by a multiplier in recognition of a variety of factors such as the degree of risk assumed by counsel in view of the contingent nature of the

case, the complexity of the litigation, the preclusion of other employment by the attorney due to acceptance of the case, and the effort expended by counsel. *See, e.g.*, *In re InfoSpace, Inc. Sec. Litig.*, 330 F. Supp. 2d 1203, 1212-13 (W.D. Wash. 2004). From 2001-2003, the average multiplier approved in common fund class actions was 4.35. *See In re Linerboard Antitrust Litig.*, No. mdl 1261, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004). From 1973-2003, the average multiplier approved in common fund class actions was 3.89. *Id.* Courts have noted that, in general, multipliers between 3 and 4.5 are common in securities class action cases. *See In re Sumimoto Copper Litig.* 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988) (collecting cases). Even though Lead Counsel expended significant effort over a two year period and faced significant risks of non-recovery, its requested multiplier is much lower than the multiplier normally awarded in such cases. Accordingly this Court should find that Lead Counsel's requested fee is supported by a lodestar cross-check, is reasonable, and should, therefore, be granted.

In sum, because the percentage fee approach is the principal method for awarding attorneys' fees in this Circuit, and because Lead Counsel's requested fee meets the six-factor test for determining whether such percentage fee requests are reasonable, this Court should grant Lead Counsel's attorneys' fee request.

## B. THIS COURT SHOULD GRANT LEAD COUNSEL'S APPLICATION FOR EXPENSES BECAUSE IT IS REASONABLE

Lead Counsel is entitled to reimbursement for the expenses they advanced to the Class. Counsel in common fund cases may recover those expenses that "'would normally be charged to a fee paying client." *Harris*, 24 F.3d at 19; *see also* 15 U.S.C. § 78u-4(a)(6) (provision of the PSLRA permitting recovery of expenses advanced by counsel to the class). Lead Counsel respectfully requests reimbursement of $606,935.50 in expenses advanced to the Class, consisting principally of fees paid to experts for their analysis of the complex accounting transactions that were the centerpiece of this litigation, as well as the costs of mediation services incurred in connection with settlement, research, and duplication costs. These

1   expenses were all necessarily incurred in Lead Counsel's prosecution of this case and its

2   success in obtaining a Settlement favorable to the Class.

3   **C.    THIS COURT SHOULD AWARD THE CLAIMS ADMINISTRATOR ITS FEES**

4        Pursuant to the Settlement, the Claims Administrator's fees and costs in the amount of

5   $91,432.07 for work performed in administering the Settlement and distributing the Settlement

6   proceeds to Class members would also be paid out of the Settlement Fund.[5]  The rates charged

7   by the Claims Administrator are in line with rates charged by the Claims Administrator in

8   similar class actions.  Joaquin Aff. ¶ 14.

9   **IV.   CONCLUSION**

10       The Settlement achieved on behalf of the Class is a highly favorable result reached

11  expeditiously.  For all the foregoing reasons, Lead Counsel respectfully requests that the Court

12  approve the Fee Application in the amount of 18 percent of the Settlement Fund ($2,340,000),

13  reimbursement of expenses in the amount of $606,935.50, and the Claims Administrator's fee

14  to date of $91,432.07.

15

16  Dated: June 1, 2010                              Respectfully submitted,

17                                                   **GRANT & EISENHOFER P.A.**

18                                                   By: /s/ Keith M. Fleischman
                                                     Jay W. Eisenhofer
19                                                   Keith M. Fleischman
                                                     485 Lexington Avenue, 29th Floor
20                                                   New York, NY 10017
                                                     Telephone: (646) 722-8500
21                                                   Facsimile: (646) 722-8501
                                                             -and-
22                                                   John C. Kairis

23

24  [5]Payment of the Claims Administrator's fees is determined by the terms of the Settlement Agreement. *See*
    Settlement Agreement at ¶¶ 4.5, 4.11.  Paragraph 3 of the proposed Order and Final Judgment, which Lead Plaintiffs
25  submitted to the Court on February 2, 2010 as part of their Motion for Preliminary Approval of Settlement, and
    which is being filed in final form herewith, states that, "The Court hereby approves the Settlement Agreement and
26  orders that the Settlement Agreement shall be consummated and implemented in accordance with its terms and
    conditions."  Accordingly, Lead Plaintiffs will seek Court approval for any additional payments to the Claims
27  Administrator (necessarily incurred in the process of collecting and administering the claims and distributing funds
    to Class members) at the time when Lead Plaintiffs apply for Court approval of a Distribution Order concerning
28  approval and rejection of the various proofs of claim.  Settlement Agreement at ¶ 4.11.  The proposed Order and
    Final Judgment has been modified to reflect the amount currently due the Claims Administrator.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1201 North Market Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100